TAYLOR v. NORFOLK AND CAROLINA RAILROAD COMPANY.

(Filed September 23, 1902.)

NEGLIGENCE—*Logs and Logging—Railroads.*

> There is not sufficient evidence in this case to be submitted to the
> jury on the question of the negligence of the railroad in
> breaking a raft of logs which had lodged against its bridge.

ACTION by W. P. Taylor against the Norfolk and Caro-
lina Railroad, heard by Judge *George H. Brown* and a jury,
at Spring Term, 1902, of the Superior Court of HERTFORD
County. From a judgment for the plaintiff, the defendant
appealed.

*L. L. Smith,* for the plaintiff.
*George Cowper,* for the defendant.

MONTGOMERY, J. A large raft of logs was broken loose
from its moorings by a high freshet in Chowan River, and
was driven down against the defendant's railroad bridge
across the river, lying broadside against the piling which sup-
ported the bridge. The defendant, through its agents and
employees, broke up the raft, by means of which the logs
passed under the bridge and many of them were lost. It
was admitted, and proved also, that the safety of the bridge
was imperiled and endangered by the lodgment of the raft.

This action was brought to recover of the defendant dam-
ages for the loss of the logs and the gear which held together
the raft. The allegation of the complaint on that point was
"that the defendant company, by its agents and employees,
wilfully, negligently, wantonly and wrongfully broke the
said raft in pieces and threw the rafting gear into the river,
and turned the said logs adrift in the current, and the said
gear sunk to the bottom of the river and the said logs floated
down the river and were lost." The plaintiff also alleged
that "if it was safe and prudent on the part of the defend-

ant's employees to remove the raft, it was not necessary, in order to save the bridge, to throw the gear to the bottom of the river, or to turn the logs adrift in the current"; and the fourth allegation is in these words: "That by the said wilful, wanton and wrongful negligence on the part of the defendant's agents and employees, the said gear and logs to the value of $250 were lost, to the plaintiff's damage."

In passing, it is curious to observe that the plaintiff got a verdict for 13 cents less than the amount demanded in the complaint, and we have searched in vain for any evidence upon which the deduction was made.

The plain meaning and intent of the complaint are that the plaintiff's damages arose from the destruction of the raft, and that that act itself, although done to save the defendant's bridge, as it was shown to have been, was wanton and wilful and negligent. There is no charge in the complaint that the defendant was negligent in not saving the logs after they were broken loose from the raft and turned adrift. The plaintiff's loss was declared to have been brought about by the *said wilful, wanton negligence* on the part of the defendant's agents; and the *said* wilful, wanton and wrongful negligence mentioned in the complaint was the breaking the raft into pieces.

The case seems to have been tried altogether upon the theory of the plaintiff as set out in his complaint. It seems to us that the only issue that ought to have been submitted on the complaint and answer was, "Did the defendant's agents negligently and wantonly and wrongfully destroy the plaintiff's property, as alleged in the complaint?" And in looking into the case we find that his Honor took that view of the matter and submitted one issue only, and that in the very language of the above.

In the course of the trial, however, it having been admitted and proved that it was necessary for the safety of the bridge

to break up the raft, and that that act was not wanton or wilful or negligent, the question arose as to the duty of the defendant in connection with the logs after they floated under the bridge and into the stream below. If that had been an issue, the greater part of his Honor's charge on that subject was correct; but we think he was wrong when he said to the jury, "If the defendant could save any of the logs by exercising due care with the means which it then actually had at its command, it was its duty to do so," without further instructing them that that would not have been the defendant's duty if the means at hand were not sufficient to save both the bridge and the logs. Certainly the first duty of the defendant was to use all available means to secure the bridge for the benefit of the traveling public and the protection of its own property. But, in any view of the case, we think there was no sufficient evidence to be submitted to the jury on the question of the defendant's conduct in reference to the logs after the raft was broken up. The only scintilla, if that, came from the son of the plaintiff, who said: "Defendant made no effort to save any of the logs or gear; plenty of men to do it there; there were between 30 and 40 men." That was only an opinion, for he mentioned no appliances, nor other means which could be put to use by the men in an attempt to save the logs. This witness says that the boss, while engaged in breaking up the raft (on a Sunday), in a high freshet of rolling waters and getting higher, in peril of his life, and fighting to save a valuable railroad bridge, when told by the witness not to break up his raft, that his father would be there soon with a tug, exclaimed "damn the logs"; and that was argued to be evidence of wilful and wanton destruction of the property. We hardly think so. The wonder is he had not said more.

W. H. Pyland, Jr., a witness for the plaintiff, said: "The defendant's agent made no effort to save the logs; they could

have done so if they had had boats below to catch the logs as they cut them loose."

Pyland, another witness for the plaintiff, said: "The raft was lengthwise against the gridge, and greatly endangered it. If the railroad people had had boats enough ready prepared, they might have saved some of the logs. They had two skiffs, but I did not see any other boats there."

And another witness, Stain, for the plaintiff said that "More logs could have been saved by taking two boats on the lower side of the bridge, taking the logs up separately as fast as they came through."

His Honor properly told the jury that the defendant was not required by law to anticipate that a raft would break loose and come against its bridge, and it was not required to have on hand boats sufficient to save the logs. Now, in connection with that part of the charge where the plaintiff's evidence is carefully examined, it will be seen to afford no grounds upon which to impute negligence to the defendant in respect to its duty to save the logs or any part of them. Plaintiff's evidence does not tend to show that there was a boat or any other appliance available with which to make an attempt to save the logs. There was, however, on the part of the defendant ample evidence going to prove that there were no facilities or appliances at hand and which could be used to save the logs. N. Y. Robinson said: "The logs doubled and piled on each other, and reaching down near the bottom row, were pressing against the bridge with such strength and dangerous force as to require immediate relief. We had only two boats, and it was impossible for our men to save the logs and at the same time bestow reasonable attention upon the safety of the bridge." And Culpepper testified that the only means of saving the logs after they had passed through the bridge was by boats, and these the railroad company did not have.

What we have said does not apply to the gear, for it seems there was some evidence tending to show that it was wantonly and negligently destroyed in breaking up the raft.

New Trial.